[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14488
Non-Argument Calendar
_____

D.C. Docket No. 5:16-cv-00141-MW-MJF

DARRELL C. HARTWELL,

Plaintiff-Appellant,

versus

RICHARD V. SPENCER,
in his official capacity as Secretary
U.S. Department of the Navy,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(November 13, 2019)

Before MARCUS, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Darrell Hartwell appeals the district court's grant of summary judgment in favor of the Secretary of the United States Department of the Navy in his lawsuit alleging employment discrimination based on disability, in violation of the Rehabilitation Act, 29 U.S.C. § 794; and race, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-16.  After reviewing the record and the parties' briefs, we affirm.

I.

Hartwell, a black male, worked as a firefighter/EMT for Naval Support Activity (NSA) Panama City for more than 16 years, until he was fired by Fire Chief James Elston—the same chief who hired Hartwell in 1998.  For his entire career at the fire department, Hartwell had trouble getting to work on time. Hartwell and the other firefighters at NSA Panama City worked on alternating 24-hour shifts, 7:00 a.m. to 7:00 a.m.  According to Chief Elston, Hartwell was late "almost every shift."  Until 2011, however, Hartwell rarely received more than verbal reprimands for his lateness.

In approximately 2011, the fire department made two changes that drew more attention to Hartwell's chronic tardiness.  First, the fire department abandoned a 2008 memorandum of agreement (MOA) with the local union, under which firefighters were permitted to exchange up to 59 minutes at the beginning or end of their shifts informally and without prior approval by management.  Using

2

the agreement, a firefighter running late for work could call and ask a coworker on the outgoing shift to cover for him, and then return the favor later in the pay period. Most days, one of the firefighters on the outgoing shift would agree to cover for Hartwell when he was late. But regardless of whether Hartwell could find a volunteer, if he was late, one of the firefighters coming off shift would have to stay—like it or not—to make sure that the fire station was fully staffed until Hartwell got there. In any event, the MOA conflicted with Navy "business rules," which required strict timekeeping and compensation for any employee working overtime. So one day at roll call, fire department management announced that informal time swaps under the MOA would no longer be allowed. Instead, firefighters would be permitted to exchange time only occasionally, and only with prior approval from a supervisor.

Second, at around the same time, Hartwell's long-time supervisor, Emory Hutchinson, retired and was replaced by Assistant Chief Andrew Pfaff. Pfaff did not appreciate Hartwell's chronic lateness and commented to another firefighter that he was going to "take care of" the problem.

According to the available record, Hartwell had only been written up for tardiness once before 2011. Beginning in April 2011, however, he was disciplined more frequently and with increasing severity. He received a "Letter of Caution" from Hutchinson in April 2011, a written reprimand from Pfaff in December 2012,

3

a one-shift/two-day suspension in June 2013, and a four-shift/eight-day suspension in March 2014, all related to his failure to get to work by the 7:00 a.m. shift change.  In October 2014, to avoid a 14-day suspension, Hartwell signed a "last chance" agreement, in which he admitted to repeated tardiness and agreed to abide by certain terms, including the requirement that he report to work on time.  But he was late again a few months later and was suspended for 14 calendar days.  In April 2015, after Hartwell was late to work yet again, Pfaff issued a written notice proposing that he be removed from federal service.

After his second violation of the "last chance" agreement, Hartwell notified Pfaff that he had been recently diagnosed with Attention Deficit/Hyperactivity Disorder (ADHD), Dysthymic Disorder (persistent depression), and Generalized Anxiety Disorder.  Hartwell said that these conditions caused him to be chronically late, in part by causing insomnia, for which his doctor prescribed medication that caused early morning drowsiness.  He also submitted a "Request for Reasonable Accommodation" to Chief Elston, asking that he be allowed to use up to an hour of sick leave on the mornings that he was late.  In addition, he verbally requested that the fire department reinstate the MOA so that he could again exchange time informally with other firefighters without prior approval.  But after meeting with Hartwell and reviewing the documentation that he submitted in support of his

request, Chief Elston accepted Pfaff's proposal and fired Hartwell effective June 1, 2015.

Hartwell sued the Secretary of the Navy in federal court, claiming that his chronic lateness was the result of his diagnosed medical conditions and that the fire department had refused to implement a reasonable accommodation for his conditions by reinstating the MOA. He also alleged that his termination was the result of race discrimination.[1] The district court granted the defendant's motion for summary judgment on both claims, and this appeal followed.

## II.

### A.

"We review a district court's grant of summary judgment *de novo*, viewing all the evidence, and drawing all reasonable factual inferences, in favor of the nonmoving party." *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d

---

[1] Hartwell also included a retaliation claim in his complaint, but he affirmatively abandoned that claim in the district court and has not raised any arguments on appeal related to retaliation.

5

1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

B.

Where, as here, a plaintiff relies on circumstantial evidence to prove discrimination, the three-part burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978); *see Center v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018) (applying the *McDonnell Douglas* framework in the context of a Rehabilitation Act claim). Under that framework, the plaintiff must first establish a "prima facie case" of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Center*, 895 F.3d at 1303. If the plaintiff makes this showing, the burden shifts to the employer, who must "articulate some legitimate, nondiscriminatory reason" for its adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. And if the employer does so, the plaintiff must then "be afforded a fair opportunity to show" that the employer's proffered reason was really pretext for discrimination. *Id*. at 804. In this third step of the *McDonnell Douglas* framework, the plaintiff's burden "merges with the ultimate burden of

6

persuading the court that she has been the victim of intentional discrimination."

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

At the summary judgment stage, the court reviews all of the relevant evidence submitted by both parties; the "ultimate issue at summary judgment" is "whether the evidence yields a reasonable inference of the employer's discrimination."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1346 n.86 (11th Cir. 2011).  A plaintiff may give rise to such an inference by (1) making out a "prima facie case" of discrimination, as that term is used in *McDonnell Douglas*, and (2) producing sufficient evidence for the trier of fact to find that the employer's proffered justification for its employment decision is pretext for unlawful discrimination.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Here, Hartwell contends that his employer discriminated against him based on disability—by failing to make reasonable accommodation for his medical conditions—and based on race.  We consider each claim in turn.

### III.

The Rehabilitation Act prohibits federal agencies and other entities receiving federal funds from discriminating against any "otherwise qualified individual with a disability" solely because of his disability.  29 U.S.C. § 794(a).  "To establish a

prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that (1) he has a disability, (2) he is otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as a result of his disability." *Boyle*, 866 F.3d at 1288.  A disability is "a physical or mental impairment that substantially limits one or more major life activities," "a record of such impairment," or "being regarded as having such an impairment."[2]  42 U.S.C. § 12102(1) (ADA); *see* 29 U.S.C. § 705(9)(B) (incorporating the definition of "disability" from § 12102).  "A person with a disability is 'otherwise qualified' if he is able to perform the essential functions of the job in question with or without a reasonable accommodation."  *Boyle*, 866 F.3d at 1288.  And an employer discriminates against a disabled person in violation of the Rehabilitation Act if it fails to provide a reasonable accommodation for the disability.  *Id.* at 1289.  The questions whether an individual is qualified and whether a reasonable accommodation can be made are determined with reference to the specific position occupied by the plaintiff.  *Boyle*, 866 F.3d at 1288.

To prove that he is "otherwise qualified" for purposes of his Rehabilitation Act claim, Hartwell "must show either that he can perform the essential functions

---

[2] Because we agree with the district court that Hartwell was not an "otherwise qualified individual," we need not decide whether Hartwell had a "disability" within the meaning of the Rehabilitation Act.

of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000).[3]  If he cannot perform all the essential functions of a firefighter/EMT, even with an accommodation, then he is not a "qualified individual" within the meaning of the Act.  *See Davis*, 205 F.3d at 1305.

Hartwell contends that his medical conditions impair his time management skills and the medication that he takes causes morning drowsiness, making it impossible for him to consistently report for work by 7:00 a.m.  The only accommodation he requested was to allow him to come to work up to an hour late without prior notice.  A few days before he was fired, Hartwell provided a note from his doctor stating that Hartwell's condition was permanent, but that his symptoms could be "minimized" "with long term individual counseling and medication."  In other words, with or without the accommodation he requested, Hartwell expected to continue his pattern of frequent tardiness indefinitely.  The pivotal issue on appeal, therefore, is whether punctuality is an essential function of the job of a firefighter/EMT.

---

[3] The legal standards used to determine liability under the Rehabilitation Act are the same as those used in comparable Americans with Disabilities Act (ADA) cases.  *See* 29 U.S.C. § 794(d).  Accordingly, cases discussing ADA standards also serve as precedent for Rehabilitation Act claims.  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam).

"'Essential functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (2000) (per curiam). Under the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8); *see also* 29 C.F.R. § 1630.2(n).

James LaConte, Region Fire Chief for Navy Region Southeast, testified that the Navy considers timely attendance to be an essential function of the job of a firefighter/EMT. Although the parties have not identified a written job description for the job of firefighter/EMT, an NSA Panama City Standard Operating Procedure (SOP) supports this assessment. The SOP provides that firefighters are expected to be present for roll call, in proper uniform and "physically and mentally capable of performing their required duties," at 7:00 a.m. daily. The same SOP also provides that, should "an emergency occur slightly before or during roll call, the shift coming on-duty will respond."

LaConte explained that the fire department establishes staffing levels based on the number of firefighters necessary for the fire department to respond to emergencies and to perform its other functions. If the required number of firefighters are not present, the fire department may not be able to respond

10

appropriately to an emergency.  To ensure that the department is fully staffed at all times, if a firefighter is late for work, one of the firefighters on the off-going shift must stay until the missing firefighter comes in or is replaced.  LaConte further testified that requiring a firefighter to stay at work after the end of his shift decreases safety due to fatigue and increases costs due to overtime.

Hartwell does not dispute the importance of having a full complement of firefighters present at the fire station and available to respond to emergencies—in Hartwell's own words, "A firefighter can't do his job if he's not at work."  Instead, he argues that his requested accommodation was reasonable because the fire department had allowed early/late relief for several years without adverse consequences.  But "prior accommodations do not make an accommodation reasonable."  *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003).  And just because an employer has, in the past, done more than required to accommodate an employee who cannot fulfill all the requirements of his job does not mean that the employer must continue to do so.  *Boyle*, 866 F.3d at 1289.

We agree with the district court that reporting to work on time was an essential function of Hartwell's job as a firefighter/EMT.  Because Hartwell could not perform this function with or without his requested accommodation, he is not "otherwise qualified" within the meaning of the Rehabilitation Act, and the district

court correctly granted the defendant's motion for summary judgment on this claim.

## IV.

We now turn to Hartwell's race discrimination claim. Title VII prohibits federal employers from discharging or discriminating against any individual "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. Similarly, 42 U.S.C. § 1981 protects employees against racial discrimination. *See* 42 U.S.C. § 1981(a); *see also Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). We analyze Hartwell's § 1981 and Title VII discrimination claims under the same framework. *See Standard*, 161 F.3d at 1330.

Hartwell does not dispute that Chief Elston made the final decision to fire him. Nor does he contend that Chief Elston, who is also black, was motivated by racial animus. Instead, he argues that Assistant Chief Pfaff, who is white, targeted him for formal discipline and termination because of his race, and that Chief Elston's decision to fire him was based on Pfaff's racially motivated disciplinary actions and recommendation to terminate him. In support of his claim, Hartwell testified that Pfaff frequently made disparaging comments about blacks, Latinos, and other minorities. For example, Pfaff once referred to another black firefighter as a "little monkey," and he told Hartwell that he thought Hartwell's children went

to school for free because they were black.  Pfaff also told a white firefighter to watch out for Hartwell because Hartwell liked to "play the race card."

In a so-called "cat's paw" case, an employer may be held liable for employment discrimination when the decisionmaker, though unbiased himself, relies—at least in part—upon the recommendation of a lower-level supervisor who acts with discriminatory intent.  *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (per curiam); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 419–20 (2011).  In such a case, "the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee."  *Stimpson*, 186 F.3d at 1331.  To the extent that Hartwell raises a "cat's paw" argument, his claim fails because he has not shown that racial animus was the real reason for Pfaff's disciplinary action against Hartwell, rather than Hartwell's chronic lateness.

"Employment discrimination claims all require proof of discriminatory intent."  *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016).  "A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence."  *Smith*, 644 F.3d at 1328.  Under the *McDonnell Douglas* framework, a plaintiff in a disparate-treatment case may raise such an inference by showing that: (1) he is a

member of the relevant protected class; (2) his employer subjected him to an adverse employment action; (3) his employer treated him less favorably than "similarly situated employees" who were not members of his protected class; and (4) he was qualified for the position. *Burke-Fowler v. Orange Cty.,* 447 F.3d 1319, 1323 (11th Cir. 2006) (per curiam). The parties agree that Hartwell is a member of a protected class and that his termination was an adverse employment action. They sharply disagree, however, on whether Hartwell has shown that he was treated differently than any other "similarly situated" firefighter.

Discrimination "'consists of *treating like cases differently*.' The converse, of course, is also true: Treating *different* cases differently is not discriminatory, let alone intentionally so." *Lewis v. City of Union City*, 918 F.3d 1213, 1222–23 (11th Cir. 2019) (en banc) (emphasis in the original) (internal citations omitted). To permit an inference of discrimination, therefore, Hartwell must show that he and his proposed "comparator" were "similarly situated in all material respects." *Id.* at 1224. In the usual case, a comparator who is "similarly situated in all material respects" "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy, guideline, or rule"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227.

14

To show that he was treated differently than other, "similarly situated" white employees, Hartwell offered a single comparator: Jason Gray, a white firefighter. Hartwell claimed that Gray was also frequently late, and that on several occasions Gray overslept by more than an hour and other firefighters had to go to his house to wake him up. Gray is not a valid comparator, however, because he was *differently* situated in two material respects.

*First*, Gray worked on a different shift and had a different immediate supervisor, Assistant Chief Sam Turner. This difference is especially significant here, where Hartwell claims that his immediate supervisor, Pfaff, was the discriminatory actor. It makes no sense to say that Turner's lenience toward Gray supports the allegation that Pfaff treated white firefighters differently. Hartwell has not presented any evidence to show that Pfaff treated chronic lateness by white firefighters under his command any differently than he did Hartwell's misconduct.

*Second*, the evidence shows that Gray was late to work much less frequently than Hartwell. Chief Elston testified that Hartwell "was late substantially more than any other firefighter at NSA Panama City, including substantially more than Jason Gray." According to Chief Elston, who attended the 7:00 a.m. change of shift, Hartwell was late "almost every shift." Gray, by contrast, was counseled about his tardiness and his conduct improved. According to Gray's supervisor,

15

Gray was late only twice in the year before Hartwell was fired.  Gray himself testified that he had been late approximately ten times in eight or nine years.

Because Gray had a different supervisor and his conduct was significantly less egregious than Hartwell's, he was not "similarly situated in all material respects," and the fact that he was not disciplined as severely as Hartwell does not give rise to an inference of discrimination.  Hartwell has not offered any other evidence to support his allegation that Pfaff's alleged racial animus was the real reason for his termination.  Accordingly, the district court correctly granted the defendant's motion for summary judgment on Hartwell's racial discrimination claim.

V.

Because Hartwell has not established that a reasonable juror could find that the fire department terminated his employment because of a disability in violation of the Rehabilitation Act, or based on his race in violation of Title VII and § 1981, we affirm the district court's grant of summary judgment in favor of the defendant.

**AFFIRMED.**